1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

8

## EASTERN DISTRICT OF CALIFORNIA

9

10 | ANDREW W. MARTIN,

Case No. 1:11-cv-01461-AWI-DLB PC

11 | Plaintiff,

**FINDINGS AND RECOMMENDATIONS, RECOMMENDING DEFENDANTS'**
12 | v.
**MOTION FOR SUMMARY JUDGMENT BE GRANTED**

13 | F. CHAVEZ, et al.,

(ECF Nos. 54, 76)

14 | Defendants.

TWENTY-ONE DAY DEADLINE

15

16 | **I.    Background**

17         Plaintiff Andrew W. Martin ("Plaintiff") is a prisoner in the custody of the California

18 Department of Corrections and Rehabilitation ("CDCR").   Plaintiff is proceeding pro se and in

19 forma pauperis in this civil action pursuant to 42 U.S.C. § 1983.   This action is proceeding on

20 Plaintiff's First Amended Complaint, filed September 6, 2012, against Defendant A. Flores for

21 excessive force in violation of the Eighth Amendment, and against Defendants Smith and Krpan for

22 deliberate indifference to a serious medical need, in violation of the Eighth Amendment.   ECF No.

23 10.  Pending before the Court is Defendants' Motion for Summary Judgment, filed January 29, 2014

24 and re-noticed on November 21, 2014.[1]   ECF Nos. 54, 76.  Plaintiff did not file an Opposition.  The

25 matter is submitted pursuant to Local Rule 230(*l*).

26 | **II.    Legal Standard**

27         Any party may move for summary judgment, and the Court shall grant summary judgment if

28

---

[1] Defendants' Motion for Summary Judgment was served with a concurrent notice pursuant to Wyatt v. Terhune, 315
F.3d 1108 (9th Cir. 2003), as required by Woods v. Carey, 684 F.3d 934, 936 (9th Cir. 2012).

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); <u>Washington Mutual Inc. v. U.S.</u>, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); <u>accord</u> <u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.   <u>In re Oracle Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  <u>In re Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex Corp.</u>, 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  <u>Id.</u> (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012).  The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

2

1

### III.   Summary of Complaint

2

3    Plaintiff was incarcerated at Sierra Conservation Center ("SCC") in Jamestown, California,

4    where the events giving rise to this action occurred.   Plaintiff names as Defendants: correctional

5    officer A. Flores; medical doctor S. Smith; and osteopathic physician and surgeon J. Krpan.[2]

6    Plaintiff alleges the following.   On January 4, 2011, Plaintiff was attacked by another inmate

7    and sustained serious injuries.   Plaintiff is a male to female transgender inmate.   Warden Chavez

8    implemented "Rolling Blackouts" at SCC during this time.   Rolling Blackouts place a facility on

9    lockdown/modified program.   During Rolling Blackouts, responder staff, correctional officers who

10   are trained to respond to emergency situations, are redirected to the other facilities. Responder staff

11   are posted at strategic positions during inmate movement and act as a deterrent to prevent assaults.

12   On January 4, 2011, responder staff were not present at Plaintiff's facility.

13

14    At 6:40 p.m., during evening chow, Plaintiff was attacked by inmate Rodriguez.   When

15   Plaintiff hit the ground, Plaintiff was semiconscious, unconscious, or in a dazed, confused state.

16   Inmate Rodriguez attacked Plaintiff repeatedly in the facial area, with strikes landing on Plaintiff's

17   eyes and right ear area.   Correctional Sergeant Murphy noticed two inmates on the ground and

18   announced the alarm over the institutional radio system.

19

20    Sergeant Murphy witnessed Defendant A. Flores utilizing his M. K. 9 pepper spray into the

21   facial area of Plaintiff.   Defendant Flores wrote and signed a false report, stating that both inmates

22   were striking each other in the upper torso and facial areas.   Plaintiff was at first misclassified for

23   administrative segregation ("ad-seg") status.

24    Plaintiff had sustained injury to the right ear and was unable to hear from that ear properly.

25   Correctional Officer Gregg was assigned to the facility medical unit that night.   Per Sergeant

26   Murphy's orders, Gregg was to decontaminate Plaintiff from the effects of the pepper spray.   Gregg

27

28   _____
[2] Plaintiff named additional defendants but they have been dismissed from the action.

ordered Plaintiff to remove her clothing.  Plaintiff had difficulty hearing Gregg's verbal orders because of the injury to Plaintiff's right ear area.  Gregg ordered Plaintiff to wash the blood from her wounds prior to being seen by licensed vocational nurse Maldando.  However, Plaintiff was unaware that she was supposed to decontaminate in the bathroom sink.  Plaintiff's injuries were active bleeding, bruised/discolored area, cut/laceration/slash, and swollen areas.  Plaintiff had observed prior inmates decontaminated by garden hose to wash an inmate's hair, arms, and legs.  Plaintiff was not told to attempt to wash the pepper spray from her hair.  Plaintiff suffered from the effects of the pepper spray through the night, and had transferred the pepper spray to her eyes and genitalia.  Plaintiff was never properly decontaminated by Gregg.

Nurse Maldando referred Plaintiff to the SCC Main Medical Facility for further treatment.  Correctional Officer Borges took command of the transport, and immediately disliked Plaintiff.  Borges manhandled Plaintiff "like a rag-doll."  Borges used derogatory remarks concerning Plaintiff's sexual orientation while simultaneously yanking and pulling Plaintiff in an unprofessional manner.  Plaintiff repeatedly told Borges that she was having trouble hearing Borges's verbal commands.  Plaintiff was at all times in handcuffs and other mechanical restraints as Borges dragged and yanked her, and verbally abused her.

After receiving dental x-rays, Borges escorted Plaintiff to the ad-seg area of the prison infirmary.  Plaintiff experienced severe burning of the eyes and genitalia because Plaintiff had transferred pepper spray by her hands and had not been properly decontaminated.  On January 5, 2011, Plaintiff was finally allowed to wash off the effects of the pepper spray in the infirmary shower with soap and water, and provided clean clothing.

On January 7, 2011, Plaintiff was seen by the oral surgeon, who reviewed the x-rays and concluded that Plaintiff had a cracked cheek bone.  Plaintiff was also seen by Defendant Smith, who treated Plaintiff with eye drops.  Plaintiff had complained of lower back pain the tailbone area, loss

of balance, and blurred, diminished vision in the right eye.  Plaintiff was released from the infirmary and returned to ad-seg.

On January 10, 2011, the captain reviewed the lockup order for Plaintiff and released Plaintiff back to general population.  Plaintiff remained in ad-seg until January 16, 2011.  On January 12, 2011, Plaintiff was seen by Defendant Krpan in the ad-seg medical unit.  Plaintiff again complained of lower back pain the tailbone area, loss of balance, and blurred, diminished vision in the right eye.  Defendant Krpan wrote a false report that the dizziness and visual difficulties had resolved.

On January 7, 2011, when Plaintiff entered ad-seg, all of Plaintiff's Keep On Person ("KOP") medication were taken, pursuant to a policy implemented by Warden Chavez.  On January 16, 2011, upon release from ad-seg, Plaintiff contacted nurse M. Cope regarding the confiscated KOP medication.  Cope assured that Plaintiff's KOP medication would be returned.  On January 20, 2011, after not receiving her medication, Plaintiff submitted a sick call slip, and was again seen by Cope.  Plaintiff informed Cope that she had still not received the KOP medication.  Plaintiff had medication for heartburn, migraine headaches, psoriasis, pain, eye drops, and a thyroid condition.  Without the thyroid medication, Plaintiff suffers from shakes or quivers, lack of sleep, odd, funny feelings, uncontrolled hunger pangs, and chipping of fingernails.  Plaintiff informed Cope of her injuries.  Cope assured Plaintiff that she would order the medication right away.

On January 25, 2011, Plaintiff had not received her medication.  Plaintiff was examined by nurse Heather, who scheduled Plaintiff to see her primary care physician the next day.  Nurse Heather also ordered Plaintiff's thyroid medication, which she received on January 27, 2011.  Doctor Thomatos, Plaintiff's primary care physician, examined Plaintiff, prescribed a medical donut, and lower bunk, lower tier chrono, and ordered an x-ray for Plaintiff's coccyx (tailbone).  Doctor Thomatos also referred Plaintiff to see an outside eye clinic.  The eye doctor could not determine

whether Plaintiff had suffered permanent injury to her right eye.  The eye doctor prescribed corrective lenses.

In early February of 2011, Plaintiff submitted another sick call slip, complaining that while housed in the prison infirmary, or the ad-seg unit, she had developed a pain rash and small sores all over her arms and legs.  Cope denied Plaintiff access to see the physician, stating that Plaintiff always had something wrong with her skin.  Cope did not look at Plaintiff's small sores.

On March 1, 2011, the sores and rash became worse, and Plaintiff submitted another sick call slip.  Plaintiff was again seen by Cope, who looked at the rash and sores and exclaimed that Plaintiff had staphylococcus.  Plaintiff was finally seen by Dr. Thomatos on March 7, 2011, who started Plaintiff on a strong antibiotic treatment.

Plaintiff alleges a violation of the First, Fourth, Eighth, and Fourteenth Amendments. Plaintiff requests as relief declaratory judgment, and monetary damages.[3]

## IV.   <u>Undisputed Facts</u>[4]

1.      At all times relevant to this action, Plaintiff was a state prisoner in the custody of the CDCR and housed at Sierra Conservation Center (SCC).  (Pl.'s Compl. at 8.)

2.      At all times relevant to this action, Defendant Flores was a correctional officer at SCC.  (Flores Decl. ¶¶ 1-2.)

3.      At all times relevant to this action, Defendant Smith was a medical doctor at SCC. (Smith Decl. ¶¶ 1-3.)

4.      At all times relevant to this action, Defendant Krpan was a medical doctor at SCC. (Krpan Decl. ¶¶ 1-3.)

---

[3] Plaintiff also requested injunctive relief.  Plaintiff is now incarcerated at Valley State Prison in Chowchilla, California, and has not demonstrated the likelihood of return to SCC.  Accordingly, this request was dismissed as moot.  <u>Andrews v. Cervantes</u>, 493 F.3d 1047, 1053 n.5 (9th Cir. 2007).

[4] Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth by Defendant as undisputed.  Local Rule 260(b).  Therefore, Defendant's statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified complaint.  <u>Jones v. Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004); <u>Johnson v. Meltzer</u>, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).

5.      At approximately 6:40 p.m. on January 4, 2011, Defendant Flores heard Sergeant Murphy yell, "We have a fight on the yard."  (Flores Decl. ¶ 3.)

6.      A Code 1 yard alarm was sounded.  When the yard alarm is sounded, all inmates are required to get down on the ground, and assigned correctional staff respond to the location of the incident.  (Flores Decl. ¶ 4.)

7.      Defendant Flores observed Plaintiff and inmate Rodriguez striking each other in the upper torso and facial areas, while the other inmates in the yard got down on the ground in compliance with the yard alarm.  (Flores Decl. ¶ 5.)

8.      Sergeant Murphy arrived at the location of the incident.  Plaintiff and inmate Rodriguez appeared to be fighting.[5]  (Flores Decl. ¶ 6.)

9.      After Sergeant Murphy arrived to the scene of the incident, Defendant Flores arrived. (Flores Decl. ¶ 6.)

10.      Defendant Flores gave orders to both inmates, but the inmates did not comply.[6] (Flores Decl. ¶ 7.)

11.      By disobeying staff orders, the inmates could have caused further injury.   (Flores Decl. ¶ 8.)

12.      For the safety of the inmates and to stop the fight, Defendant Flores utilized his M.K. 9 Oleoresin Capsicum (OC) pepper spray and administered a one-second burst of pepper spray to both inmates from a position of approximately five feet away.  (Flores Decl. ¶ 9.)

---

[5] Defendant Murphy contends that upon arrival he ordered the inmates to get down but the inmates did not comply.  This fact is disputed by Plaintiff in his verified complaint wherein he states that upon arrival of Sergeant Murphy, Plaintiff and inmate Rodriguez were already on the ground. Pl.'s FAC, p. 10, ¶ 34.  Plaintiff does not dispute that it appeared to Murphy that the two inmates were engaged in what appeared to be a fight. Pl.'s FAC, p. 10, ¶ 38.

[6] Defendant Flores states he gave orders for both inmates to get down, but they did not comply and continued to fight.  In his FAC, Plaintiff states he was not fighting, that inmate Rodriguez was attacking him only, and that Plaintiff was semi-conscious or unconscious at the time, and either sitting up or attempting to sit up.  Pl.'s FAC, p. 10, ¶¶ 35-36, 48-49.

7

13.     As Defendant Flores attempted to administer the pepper spray, inmate Rodriguez jumped out of the way, and the pepper spray hit Plaintiff in the facial area. (Flores Decl. ¶ 9; Pl.'s FAC ¶ 39.)

14.     Defendant Flores did not aim the OC spray directly into Plaintiff's eyes but rather toward his facial area. (Flores Decl. ¶ 9.)

15.     After Defendant Flores pepper-sprayed Plaintiff, both inmates complied and got down into a prone position.  (Flores Decl. ¶ 10.)

16.     After Plaintiff was pepper-sprayed, he was escorted to the Tuolumne medical clinic to be decontaminated.  Plaintiff's January 4, 2011, medical examination report shows that Plaintiff was exposed to pepper spray, decontaminated, given self-decontamination instructions, and did not refuse decontamination.  (Flores Decl. ¶ 12; Pl's Dep. 47:10-11; Chen Decl., Ex. A.)

17.     At the time Defendant Flores pepper-sprayed Plaintiff, it was not apparent who the initial aggressor was.  (Flores Decl. ¶¶ 13-14.)

18.     Defendant Flores authored a Rules Violation Report (RVR) log number 01-11-T-004 for fighting.  The RVR was issued to Plaintiff but was dismissed due to the determination that inmate Rodriguez started the fight.  Plaintiff was not found guilty of the RVR. (Flores Decl. ¶ 14; Pl.'s Dep. 17:21-25, 18:20-21.)

19.     Because the inmates disobeyed orders, the safest option to ensure the inmates did not further injure one another or correctional staff was for Defendant Flores to pepper-spray the inmates. (Flores Decl. ¶ 15.)

20.     During his employment with CDCR, Defendant Flores has only utilized pepper-spray on an inmate once, during the incident with Plaintiff on January 4, 2011. (Flores Decl. ¶ 16.)

21.     Plaintiff has no memory from when he felt a tug on his arm by inmate Rodriguez until he was escorted to medical because when inmate Rodriguez punched him, Plaintiff was knocked out and rendered dazed and confused. (Pl.'s Dep. 23:19-23; 25:1-3; 26:3-5.)

22.     Plaintiff does not recall hearing the yard alarm sound or hearing orders to get down. (Pl.'s Dep. 26:16-27:8; 30:15-16.)

23.     Plaintiff does not recall Defendant Flores arriving to the scene of the incident or pepper-spraying him. (Pl.'s Dep. 29:21-22; 30:17-19.)

24.     On January 4, 2011, Plaintiff's primary care physician. Dr. Thomatos, ordered Plaintiff to be transferred to the Outpatient Housing Unit (OHU).  Dr. Thomatos ordered daily neurological examinations and for Plaintiff to be seen by a roving physician the following day. During Plaintiff's stay at the OHU from January 4, 2011, to January 7, 2011,  Plaintiff received ongoing daily neurological checks by nurses. (St. Clair Decl. ¶¶ 10-11.)

25.     On January 5, 2011, x-rays were taken of Plaintiff's jaw/zygoma (cheekbone) and lumbar spine.  The radiologist reports of both facial and lumbar spines were negative for fractures. (St. Clair Decl. ¶¶ 12, 16, 17.)

26.     On January 5, 2011, Dr. St. Clair was the initial physician to treat Plaintiff in the OHU.  During the visit, St. Clair noted that Plaintiff sustained facial injuries, including bruises and small cuts.  Plaintiff complained of low back pain which was relieved with Tylenol with Codeine. (St. Clair Decl. ¶ 13; Pl.'s Dep. 60:23-61:7; 64:19-21; 65:25-66:11.)

27.     St. Clair also noted that the facial x-rays showed a fracture but determined that treatment was not indicated. (St. Clair Decl. ¶ 14.)

28.     On January 7, 2011, Defendant Smith evaluated Plaintiff in the OHU and took notes. (Smith Decl. ¶¶ 5, 10; Pl.'s Dep. 67:11-18, 68:9-11.)

29.     At the time Defendant Smith saw Plaintiff, Plaintiff had already been treated with Tylenol with Codeine for his low back pain. (Smith Decl. ¶¶ 6, 13; St. Clair Decl. ¶¶ 13, 21, 22.)

30.     For security reasons, Defendant Smith did not enter Plaintiff's cell.  Smith was able to adequately evaluate Plaintiff through the cell bars. (Smith Decl. ¶¶ 7-9; St. Clair Decl. ¶ 20.)

31.     If security concerns are present, it would not be improper for a doctor to conduct an examination through the bars of a closed cell door if the doctor is able to adequately evaluate and treat the patient without entering the cell.  None of the tests performed required Defendant Smith to enter the cell, and the level of care provided was not compromised by his not entering the cell. (St. Clair Decl. ¶ 20.)

32.     During the visit, Defendant Smith noted that Plaintiff stated that he felt slightly dizzy, had blurry vision in his right eye that was improving, and had an itchy sensation in his right eye. (Smith Decl. ¶ 12.)

33.     Defendant Smith reviewed Plaintiff's vital signs. (Smith Decl. 14.)

34.     Defendant Smith visually examined Plaintiff's head, eyes, ears, nose, and throat. Smith noted that Plaintiff had bruises on her face and eye orbit area but did not have bleeding in her pupils nor redness in the whites of her eyes. (Smith Decl. ¶ 16.)

35.     Using an opthalmoscope, Defendant Smith conducted a funduscopic examination of Plaintiff's eyes.  Smith noted that the blood vessels in Plaintiff's eyes appeared normal and there was no sign of bleeding in the back of the eyes.  (Smith Decl. ¶ 17.)

36.     Defendant Smith conducted a neurologic examination, comprised of a series of tests, including asking Plaintiff to visually track his finger, raise his eyebrows, smile, shrug his shoulders, swallow, and extend his tongue out.  Smith noted that Plaintiff's cranial nerves two through twelve were intact.  (Smith Decl. ¶ 18.)

37.     Due to Plaintiff's complaints about dizziness, Defendant Smith checked Plaintiff's ability to balance by asking him to stand on one foot on each side and to touch his finger to his nose. (Smith Decl. ¶ 19.)

38.     To further assess Plaintiff's ability to balance, Smith conducted a Romberg Test by asking Plaintiff to close his eyes, hold his hands in front of him as if he were holding a plate, and stand with his feet slightly apart. (Smith Decl. ¶ 20.)

39.     Defendant Smith determined that although Plaintiff suffered a possible fractured cheekbone, treatment was not indicated because Plaintiff's facial injury did not present significant physical deformity or evidence of nerve entrapment affecting the eyes. (Smith Decl. ¶ 21.)

40.     Defendant Smith prescribed eye drops and scheduled a follow-up visit with his primary medical doctor in 3-5 days and discharged Plaintiff from the OHU. (Smith Decl. ¶ 22; Pl.'s Dep. 72:23-24; 74:15-23.)

41.     Defendant Smith advised Plaintiff to contact medical if his dizziness worsened and noted "re-assess at follow-up." (Smith Decl. ¶ 23.)

42.     Defendant Smith's visit with Plaintiff lasted approximately five minutes. (Smith Decl. ¶ 24; Pl.'s Dep. 84:10-12.)

43.     Other than the visit with Defendant Smith on January 7, 2011, Plaintiff did not see Smith on any other occasion for medical treatment. (Smith Decl. ¶ 25; Pl.'s Dep. 67:11-18.)

44.     On January 12, 2011, Defendant Krpan saw Plaintiff in the ad-seg unit for an OHU discharge follow-up. (Krpan Decl. ¶ 5; St. Clair Decl. ¶ 23; Pl.'s Dep. 75:8-76:4; 76:5-8.)

45.     During the visit, Defendant Krpan noted that Plaintiff stated that the dizziness he had in the OHU was improving and that his visual difficulties had resolved.  Plaintiff still complained of some discomfort in his left cheekbone area and some sacral and coccyx region discomfort. (Krpan Decl. ¶ 9.)

46.   Defendant Krpan reviewed Plaintiff's vital signs. (Krpan Decl. ¶ 11.)

47.   Defendant Krpan observed that Plaintiff had bruising around both eyes.   Krpan palpated Plaintiff's left cheekbone area and noted some tenderness in that region but no bleeding or redness in the whites of his eyes.   Krpan performed a horizontal nystagmus test and determined that Plaintiff's eye orbit muscles were intact and that a significant orbital fracture was unlikely. (Krpan Decl. ¶ 12.)

48.   Defendant Krpan noted that Plaintiff's facial x-rays were unfortunately not available in Plaintiff's chart for Krpan's review on January 12, 2011. (St. Clair Decl. ¶ 25.)

49.   Defendant Krpan examined the inside of Plaintiff's nostrils and observed some indication of prior bleeding in the right septum.   Also, Krpan visually examined the inside of Plaintiff's mouth, palpated his neck, listened to Plaintiff's heart and lungs, and palpated his sacral (posterior pelvic) and coccyx (tail bone). (Krpan Decl. ¶¶ 13-17.)

50.   Krpan recommended considering follow up of zygomatic arch x-rays depending on the previous results as well as consideration of a sacral or coccyx x-ray if he continued to have symptoms.  (Krpan Decl. ¶ 18.)

51.   Defendant Krpan advised Plaintiff to put in a health care services request if he continued to experience problems while in ad-seg, otherwise to see his primary care physician. (Krpan Decl. ¶ 19; St. Clair Decl. ¶ 23.)

52.   Other than the visit with Krpan on January 12, 2011, Plaintiff did not see Krpan on any other occasion for medical treatment. (Krpan Decl. ¶ 21; Pl.'s Dep. 67:11-18.)

53.   On January 17, 2011, Plaintiff put in a request to be seen regarding his low back pain. On January 21, 2011, Dr. St. Clair treated Plaintiff in regards to his request.  (St. Clair Decl. ¶ 28.)

54.   On January 27, 2011, Dr. Thomatos saw Plaintiff for a follow-up and ordered coccyx x-rays to be taken within one week.  (St. Clair Decl. ¶ 30.)

55.     On January 27, 2011, Plaintiff was seen by an outside eye doctor, who performed an eye exam, diagnosed myopia correctable to 20/20, and issued a prescription for new glasses. (St. Clair Decl. ¶ 31; Pl.'s Dep. 79:22-80:15.)

56.     On January 28, 2011, Dr. Thomatos followed up with Plaintiff after his eye appointment.  Plaintiff stated that he got his donut pillow and noticed it is so much more comfortable to sit on.  (St. Clair Decl. ¶ 32.)

57.     Initial readings by several medical providers of Plaintiff's facial x-rays showed that Plaintiff had a left cheekbone fracture. (Smith Decl. ¶ 21; St. Clair Decl. ¶¶ 14-15.)

58.     On January 5, 2011, Plaintiff's facial bones x-ray was read by a radiologist, who specializes in reading x-rays.  The radiologist reported that "No facial fracture can be identified. The sinuses are well aerated." (St. Clair Decl. ¶ 16.)

59.     On January 14, 2011, Dr. Thomatos requested a re-read by radiologist of Plaintiff's facial x-rays.  The x-rays were re-read by Dr. W. Griffin, a radiologist at Mark Twain St. Joseph's Hospital, on January 15, 2011.  Dr. Griffin noted in his findings that "[t]he irregularity that someone has marked with a crayon, left zygoma, is probably the normal sutural juncture between the zygomatic portion and the frontal portion. (St. Clair Decl. ¶ 26.)

60.     A "normal sutural junction" refers to an anatomical line where bones unite in childhood.  Thus, the second read by Dr. Griffin, who specializes in reading x-rays, makes clear that the apparent "fracture" on Plaintiff's left cheekbone was merely a suture line likely not caused by the January 4, 2011, trauma.  This explains the previous findings by Dr. St. Clair, Dr. McDow, and Dr. Jennings of a fracture.  (St. Clair Decl. ¶ 27.)

61.     On February 2, 2011, x-rays which were taken of Plaintiff's sacrum/coccyx revealed that Plaintiff did not sustain a fractured pelvis, sacrum, or coccyx. (St. Clair Decl. ¶ 33.)

62.     Dr. St. Clair opines that Defendant Smith provided Plaintiff with appropriate treatment within the standard of care. (St. Clair Decl. ¶ 19.)

63.     There is no treatment for a coccyx injury other than pain management.  A coccyx injury heals naturally over time, and can take quite some time to heal. (St. Clair Decl. ¶¶ 22, 30.)

64.     Plaintiff did not suffer a bleeding right eye orbit. (St. Clair Decl. ¶ 34.)

65.     Dr. St. Clair opines that Defendant Krpan provided Plaintiff with appropriate treatment within the standard of care. (St. Clair Decl. ¶ 24.)

66.     Pepper spray does not cause myopia. (St. Clair Decl. ¶ 31.)

## VI.   Discussion

### A.    Deliberate Indifference – Conditions of Confinement

#### 1.     Legal Standard

The Cruel and Unusual Punishments Clause of the Eighth Amendment protects prisoners from the use of excessive physical force.  Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S.Ct. 1175 (2010) (per curiam); Hudson v. McMillian, 503 U.S. 1, 8-9, 112 S.Ct. 995 (1992).  What is necessary to show sufficient harm under the Eighth Amendment depends upon the claim at issue, with the objective component being contextual and responsive to contemporary standards of decency. Hudson, 503 U.S. at 8 (quotation marks and citations omitted).  For excessive force claims, the core judicial inquiry is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  Wilkins, 559 U.S. at 37 (citing Hudson, 503 U.S. at 7) (quotation marks omitted).

Not every malevolent touch by a prison guard gives rise to a federal cause of action. Wilkins, 559 U.S. at 37 (citing Hudson, 503 U.S. at 9) (quotation marks omitted).  Necessarily excluded from constitutional recognition is the de minimis use of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.  Wilkins, 559 U.S. at 37-8, 130

14

S.Ct. at 1178 (citing <u>Hudson</u>, 503 U.S. at 9-10) (quotations marks omitted).  In determining whether the use of force was wanton and unnecessary, courts may evaluate the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  <u>Hudson</u>, 503 U.S. at 7 (quotation marks and citations omitted).

While the absence of a serious injury is relevant to the Eighth Amendment inquiry, it does not end it.  <u>Hudson</u>, 503 U.S. at 7.  The malicious and sadistic use of force to cause harm always violates contemporary standards of decency.  <u>Wilkins</u>, 559 U.S. at 37 (citing <u>Hudson</u>, 503 U.S. at 9) (quotation marks omitted).  Thus, it is the use of force rather than the resulting injury which ultimately counts.  <u>Id</u>. at 37-8.

2.    <u>Analysis</u>

Plaintiff's claim against Defendant Flores arises out of the altercation that took place on January 4, 2011.  At approximately 6:40 p.m., a Code 1 yard alarm was sounded and Defendant Flores heard Sergeant Murphy yell, "We have a fight on the yard."  Defendant Flores arrived and observed Plaintiff and inmate Rodriguez in a fight.  Flores did not know who the aggressor was.  While there is some dispute whether the inmates were upright or were on the ground, there is no dispute that the two were engaged in a fight and at least one inmate was throwing punches.  Defendant Flores gave both inmates orders, but the fight continued.  By disobeying staff orders, the inmates could have caused further serious injury to each other.  For the safety of the inmates and to put an end to the fight, Defendant Flores used his OC pepper spray and directed a one-second burst toward the facial area of both inmates from a position of approximately five feet away.  Inmate Rodriguez jumped out of the way, and the pepper spray hit Plaintiff in the facial area.  After Defendant Flores administered the OC pepper spray, the inmates complied.

Plaintiff claims that Defendant Flores pepper-sprayed her while she was in a dazed, semi-

conscious state after having sustained nineteen facial and head wounds including a bleeding right eye orbit.  Plaintiff also notes that Flores noted in his report that the video clearly showed that inmate Rodriguez was the aggressor.

However, the undisputed facts show that Defendant Flores arrived to find the inmates in the middle of a fight and he did not know who the aggressor was.  It is undisputed that Flores gave orders to stop which were ignored.  Further, Flores attempted to administer pepper-spray to both inmates but Rodriguez jumped out of the way and this resulted in only Plaintiff being pepper-sprayed.  Given these facts, Defendant's use of pepper-spray constituted a good-faith effort to maintain or restore discipline, and it was not done maliciously or sadistically to cause harm.  Wilkins, 559 U.S. at 37.  In addition, the amount of force used was *de minimus*.  It is undisputed that Defendant applied only a one-second burst of spray, that the inmates immediately complied, and that Plaintiff was immediately escorted to the medical clinic for decontamination and treatment.

Further, the injuries sustained by Plaintiff were not caused by Defendant.  It is undisputed that inmate Rodriguez caused the numerous facial wounds and head trauma to Plaintiff.  With respect to the alleged scarring of the eyes and genitalia caused by the effects of the pepper spray, Plaintiff does not allege that Defendant Flores was responsible for escorting her and decontaminating her.

In summary, the Court finds that the use of force was *de minimis* as a matter of law and that the undisputed facts show it was not employed maliciously and sadistically for the very purpose of causing harm.  Hudson, 503 U.S. at 9-10.  Accordingly, the Court finds that Defendant Flores is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment excessive force claim.

**B.**     **Deliberate Indifference – Medical Care**

1.     Legal Standard

The Eighth Amendment's prohibition against cruel and unusual punishment protects

prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement.  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)) (quotation marks omitted).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted).

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted).  To maintain an Eighth Amendment claim, inmates must show deliberate indifference to a substantial risk of harm to their health or safety.  E.g., Farmer, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

For claims arising out of medical care in prison, Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)).  The existence of a serious medical need is the objective element of an Eighth Amendment claim and deliberate indifference is the subjective element.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012).

2.      Analysis – Defendant Smith

Plaintiff alleges that Defendant Smith conducted an inadequate examination.  He alleges Defendant Smith failed to ask necessary questions or take a history, failed to conduct relevant tests,

and failed to refer Plaintiff to a specialist concerning his blurred vision and loss of balance. Plaintiff complains that Defendant Smith should have conducted a physical examination rather than an examination through his cell bars. Plaintiff claims that Defendant Smith's grossly perfunctory examination demonstrated deliberate indifference.

The undisputed evidence shows that Defendant Smith conducted an examination through the cell bars due to security reasons. The evidence demonstrates that an examination can be completed adequately through cell bars when security concerns are present. Here, the undisputed evidence shows that Defendant Smith conducted an examination of Plaintiff which was adequate under the circumstances and consistent with the standard of care. Defendant Smith took notes of Plaintiff's symptoms and reviewed Plaintiff's vital signs. Smith noted that Plaintiff was being treated with Tylenol with Codeine for his back pain. Smith noted Plaintiff's complaints of dizziness, blurry vision and itchy sensation in the right eye. Smith examined Plaintiff's head, eyes, ears, nose and throat; he noted the various injuries and bruises to his face and eye area. Smith conducted a funduscopic examination of Plaintiff's eyes and noted that the eyes appeared normal with no visible signs of bleeding in the back of the eyes. Defendant Smith then conducted a serious of neurologic examinations and noted that Plaintiff's cranial nerves one through twelve were intact. Defendant Smith then conducted a series of tests to evaluate Plaintiff's complaints of dizziness and loss of balance. Defendant Smith determined that although Plaintiff suffered a possible fractured cheekbone, treatment was not indicated because the injury did not present physical deformity or evidence of nerve entrapment. Defendant Smith prescribed eye drops and scheduled a follow-up visit, and advised Plaintiff to notify medical if the dizziness worsened.

Defendant has submitted evidence in the form of an expert opinion that none of the tests performed by Defendant Smith required him to enter the cell, and that the level of care provided was appropriate. Plaintiff has offered no evidence that the course of treatment taken by Defendant Smith

was medically unacceptable.  Thus, the undisputed evidence shows that Defendant Smith was not deliberately indifferent to a substantial risk of harm to Plaintiff's health.  Accordingly, there is no dispute as to any material fact and Defendant is entitled to summary judgment.  The undisputed evidence, when viewed in a light most favorable to Plaintiff, does not establish an Eighth Amendment violation.

         3.      <u>Analysis – Defendant Krpan</u>

Plaintiff complains that Defendant Krpan also performed a grossly perfunctory examination by failing to conduct an adequate examination, failing to ask necessary questions or take a history, and failing to conduct appropriate tests.  Plaintiff further alleges that Defendant Krpan failed to refer Plaintiff to a specialist.

Here, the evidence shows that Defendant Krpan conducted an examination of Plaintiff for an OHU discharge follow-up.  The evidence shows that Krpan reviewed Plaintiff's vital signs, the injuries Plaintiff sustained, and Plaintiff's complaints of pain.  It is undisputed that Krpan palpated Plaintiff's cheekbone and noted tenderness in the region but no redness or bleeding in the whites of Plaintiff's eyes.  Further, Krpan conducted a horizontal nystagmus test and determined that Plaintiff's eye muscles were intact and that a significant fracture was unlikely.  Defendant Krpan examined the insides of Plaintiff's nostrils and mouth, palpated Plaintiff's neck, listened to Plaintiff's heart and lungs, and palpated his sacral and coccyx.  Krpan recommended additional x-rays depending on the previous x-ray results.  Krpan advised Plaintiff to put in a health care services request if he continued to experience problems.

Plaintiff is required to produce admissible evidence that the course of treatment prescribed by Defendant was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Plaintiff's health.  <u>Snow</u>, 681 F.3d at 988 (quotation marks and citation omitted).  Plaintiff has not done so.  Therefore, there is no material factual dispute with

respect to the propriety of Defendant's examination and chosen course of treatment.   Accordingly, the Court finds that Defendant Smith is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

## C.   Qualified Immunity

Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."   Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).   "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

As the Court has found that no constitutional violation has occurred, it need not further discuss the issue of qualified immunity.

## VII.   Conclusion and Recommendation

For the reasons set forth above, the Court HEREBY RECOMMENDS that Defendant's motion for summary judgment, filed on January 29, 2014 and re-noticed on November 21, 2014, be GRANTED, thus concluding this action in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).   Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.   Local Rule 304(b).   The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   Any response to the objections must be filed within **ten (10) days** from the date of service of the objections.   Local Rule 304(d).   The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

   Dated:   __September 2, 2015__                  _____ /s/ *Dennis L. Beck*
                                                        UNITED STATES MAGISTRATE JUDGE